**FILED**

**U.S. Bankruptcy Appellate Panel
of the Tenth Circuit**

**September 30, 2025**

**Anne M. Zoltani
Clerk**

NOT FOR PUBLICATION[1]

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE TENTH CIRCUIT

_____

IN RE DAVID W. MCHUGH,

Debtor.

_____

DAVID W. MCHUGH,

Appellant,

v.

JOLI A. LOFSTEDT, Chapter 7 Trustee,

Appellee.

BAP No. CO-24-20

Bankr. No. 24-14454
Chapter 7

OPINION

_____

Appeal from the United States Bankruptcy Court
for the District of Colorado

_____

Before **SOMERS**, **HALL**, and **THURMAN**, Bankruptcy Judges.

_____

**HALL**, Bankruptcy Judge.

After a state court entered a substantial judgment against him, David McHugh

filed a chapter 11 petition. The Bankruptcy Court converted the case to chapter 7 after

finding (i) McHugh was not in financial distress, (ii) the filing served as a tactical

---

[1] This unpublished opinion may be cited for its persuasive value, but is not
precedential, except under the doctrines of law of the case, claim preclusion, and issue
preclusion. 10th Cir. BAP L.R. 8026-6.

advantage in ongoing litigation, and (iii) the dispute was essentially between two parties. McHugh appeals. For the reasons set forth below, we affirm.

## I.    Background

In 2019, David McHugh's ("Appellant") former business partner Kenton Hopkins ("Appellee")[2] filed suit against him in state court alleging breach of a 2010 partnership agreement relating to their real estate business.[3] Following extensive litigation, including an eight-day bench trial in 2023, the state court entered judgment against Appellant on February 29, 2024 (the "Judgment").[4] The state court found Appellant had materially breached the partnership agreement and awarded Appellee $1,658,286.28 in damages and interest.[5] Subsequently, the state court also awarded Appellee over $675,000 in attorneys' fees and costs.[6] Appellant appealed the Judgment but did not request a stay pending appeal from the state trial court or the appellate court.[7] Approximately five months later, Appellee initiated collection efforts including filing judgment liens and obtaining a writ of garnishment that froze Appellant's bank accounts on July 25, 2024.[8] Rather than objecting to the garnishment in state court or asserting exemptions therein or seeking a

---

[2] On June 10, 2025, this Court granted the Chapter 7 Trustee's unopposed motion to be substituted as an appellee for Appellee. BAP ECF No. 34.

[3] *Order on Motion to Dismiss or Convert* at 5 in Appellant's Am. App. at 203.

[4] *Id.*

[5] *Id.*

[6] *Id.* at 7 in Appellant's Am. App. at 205.

[7] *Id.* at 1 in Appellant's Am. App. at 199.

[8] *Id.* at 6 in Appellant's Am. App. at 204.

stay pending appeal, Appellant filed for chapter 11 bankruptcy protection on August 1, 2024.[9]

On August 26, 2024, Appellee filed a motion to dismiss or convert under 11 U.S.C. § 1112(b)[10] arguing the case was filed in bad faith as a two-party dispute to frustrate enforcement of the Judgment.[11] Appellant, however, claimed the purpose of the bankruptcy case was to pause collection efforts, allow time for his state court appeal of the Judgment to proceed and conclude, and permit him to resolve his long-standing tax issues with the IRS.[12]

On September 19, 2024, the Bankruptcy Court conducted a hearing on, among other matters, the motion to dismiss or convert, and the parties presented the following evidence by proffer.[13] Appellant is a commission-based real-estate broker with irregular cash flow and earnings that can exceed $1 million per year (before expenses).[14] Appellant appealed the Judgment and attempted to obtain an appellate bond but was unable to do so

---

[9] *Id.* at 7 in Appellant's Am. App. at 205.

[10] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code (the "Code"), 11 U.S.C. § 101 et seq.

[11] *Motion to Dismiss or Convert Bankruptcy Case* in Appellant's Am. App. at 128.

[12] *Objection to Motion to Dismiss or Convert* at 2, 4 in Appellant's Am. App. at 154, 156.

[13] Tr. at 17 in Appellant's Am. App. at 267 ("I . . . concur with the parties' requests to present evidentiary proffers[.]"). *See* Colorado L.B.R. 2081-3(c) ("The Court will only accept evidence by way of an oral offer of proof and exhibits. Such offers must provide sufficient detail to enable the Court to make specific findings based thereon and must include the identity of the witnesses available to testify at an evidentiary hearing and an explanation of their expected testimony. . . . [T]he Court may consider the offers of proof and, absent the need for an evidentiary hearing, grant or deny the request for dismissal.").

[14] *Id.* at 37–38 in Appellant's Am. App. at 287–88.

because of his failure to file tax returns for ten years.[15] On July 25, 2025, Appellant's seven bank accounts were frozen as a result of Appellee's writ of garnishment, these accounts were the only bank accounts in his name, and, as a result, he was unable to pay his personal or business expenses.[16]

As of the petition date, the Judgment together with accrued interest and an attorneys' fee award totaled approximately $2,433,609.99.[17] Appellant's schedules reflected more than $7.66 million in assets, among them multiple vehicles, heavy/construction equipment, a warehouse, and real estate, and debts totaling approximately $4 million, with net equity exceeding $3.5 million.[18] Two of Appellant's bank accounts were 80% exempt as "earnings" and four other accounts were jointly titled with the minor daughter and funded by life-insurance/GoFundMe proceeds following the death of his wife with proceeds that belonged fully to his daughter.[19]

Appellant had not filed tax returns in approximately ten years but made substantial quarterly payments during that period, the amount of which is unknown, and the IRS filed a proof of claim in the estimated amount of $1,024,029.79.[20] Appellant was current on all debts other than the Judgment and tax liabilities and, other than collection efforts related to the Judgment, no collection actions against Appellant were pending on the

---

[15] *Id.* at 39 in Appellant's Am. App. at 289.
[16] *Id.* at 40–42 in Appellant's Am. App. at 290–92.
[17] *Id.* at 22 in Appellant's Am. App. at 272.
[18] *Id.* at 24 in Appellant's Am. App. at 274.
[19] *Id.* at 43–44 in Appellant's Am. App. at 293–94.
[20] *Id.* at 23 in Appellant's Am. App. at 273.

petition date.[21] Appellant also supported his girlfriend in Washington with $2,800 per month in living expenses, and two weeks before filing, signed a BMW lease with a $1,800 monthly payment despite already owning numerous vehicles.[22] Appellant included his girlfriend's rent expense and BMW lease payment in his emergency request to use cash collateral in the bankruptcy case.[23] In addition, Appellant maintained a vacant condominium in Denver with approximately $357,052 of equity[24] that could be rented but was not. Appellant also owned a warehouse in Gypsum, Colorado with approximately $329,525 in equity[25] used primarily to store unused vehicles valued in excess of $200,000[26] and staging furniture for his real estate business valued at $2,500.[27] He also owned two properties in Wolcott, Colorado, with no secured debt except for the Judgement lien, worth approximately $2.35 million with a partially constructed house left unfinished for more than two years. Finally, Appellant also owned a half interest in a Vail condominium from which he received no rental income, as well as his primary residence in Avon, Colorado.[28]

---

[21] *Id.* at 24–25 in Appellant's Am. App. at 274–75.

[22] *Id.* at 25–26, 30 in Appellant's Am. App. at 275–76, 280.

[23] *Id.* at 26, 30 in Appellant's Am. App. at 276, 280.

[24] The Denver property was worth around $500,000 and is subject to $142,948.92 in secured debt before accounting for the Judgment. *Id.* at 45 in Appellant's Am. App. at 295.

[25] The Gypsum property was worth around $400,000 and is subject to a mortgage debt of $70,475.89. *Id.* at 45 in Appellant's Am. App. at 295.

[26] Schedule A/B in Appellant's Am. App. at 30–33.

[27] Tr. at 27–28 in Appellant's Am. App. at 277–78.

[28] *Id.* at 28–29, 46 in Appellant's Am. App. at 278–79, 296.

On October 8, 2024, the Bankruptcy Court entered an order converting the case to chapter 7 (the "Order"). Based on the proffers, the Bankruptcy Court found (i) Appellant was not in financial distress and had filed bankruptcy to gain a tactical advantage in ongoing litigation, and (ii) the bankruptcy case primarily involved a two-party dispute between Appellant and Appellee. Appellant appealed the Order on October 22, 2024.

## II.    Jurisdiction

The BAP has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless a party elects to have the district court hear the appeal.[29] No party elected to have the district court hear the appeal. Appellant timely filed a notice of appeal from the Order, which is a final order.[30] Thus, the BAP has jurisdiction over this appeal.

## III.    Issues on Appeal and Standard of Review

Appellant identifies three issues on appeal:

1.    "[D]id the bankruptcy court err in finding that McHugh was not in financial distress on the date his Chapter 11 bankruptcy case was filed, despite all of McHugh's bank accounts being frozen, and having no access to cash on that date?"

2.    "[D]id the bankruptcy court err in holding that McHugh's bankruptcy case was filed for tactical litigation advantage. . . . McHugh asserts the bankruptcy court erred by not properly accounting for McHugh's cash position on the date the bankruptcy case was file[d] or McHugh's tax issues[?]"

---

[29] 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr. P. 8003, 8005.

[30] *In re Vista Foods U.S.A., Inc.*, 202 B.R. 499, 500 (10th Cir. BAP 1996) ("The Bankruptcy Court's Order converting the Debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code is final.").

3.    "[D]id the bankruptcy court err in finding McHugh's case was primarily a two-party dispute between McHugh and Appellee when the Internal Revenue Service had filed its own claim for more than $1,000,000.00[?]"[31]

Under § 1112(b), a bankruptcy court is given broad discretion to convert a case to chapter 7 "for cause."[32] The standard of review for such discretionary determinations is abuse of discretion.[33] Under the abuse of discretion standard, the BAP will not disturb a bankruptcy court's decision unless it has "a definite and firm conviction that the [bankruptcy] court made a clear error of judgment or exceeded the bounds of permissible choice under the circumstances."[34] A clear example of an abuse of discretion exists where the court "commits a legal error or relies on clearly erroneous factual findings."[35] "Put another way, an abuse of discretion occurs when the [bankruptcy] court's decision is arbitrary, capricious or whimsical, or results in a manifestly unreasonable judgment."[36]

The BAP reviews the bankruptcy court's conclusions of law de novo and factual findings for clear error.[37] Where there are two permissible views of the evidence, the

---

[31] Appellant's Br. at 1.

[32] *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 989) ("The bankruptcy court has broad discretion under § 1112(b).").

[33] *In re Ruiz*, 455 B.R. 745, 747 (10th Cir. BAP 2011) (citing *Pierce v. Underwood*, 487 U.S. 552, 558 (1988)).

[34] *United States v. Ortiz*, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986).

[35] *Cruz v. Farmers Ins. Exch.*, 42 F.4th 1205, 1210 (10th Cir. 2022) (internal citation omitted); *see also Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1191 (10th Cir. 2018) ("A clear example of an abuse of discretion exists where the trial court fails to consider the applicable legal standard or the facts upon which the exercise of its discretionary judgment is based." (quoting *Ohlander v. Larson*, 114 F.3d 1531, 1537 (10th Cir. 1997))).

[36] *In re Frontline Med. Servs. LLC*, 665 B.R. 818, 826 (10th Cir. BAP 2024) (citation modified).

[37] *In re Miller*, 288 B.R. 879, 881 (10th Cir. BAP 2003).

7

factfinder's choice between them cannot be clearly erroneous, and an appellate court may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.[38]

#### IV.    Statutory Framework

11 U.S.C. § 1112(b) governs motions to dismiss or convert a chapter 11 case and provides as follows:

> [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause[.]

Section 1112(b)(4) provides a non-exhaustive list of what constitutes cause for conversion under this provision. Although not part of this list, we also recognize that bad faith constitutes cause for conversion.[39]

To convert a chapter 11 case based on bad faith, the Tenth Circuit directs bankruptcy courts to generally consider "any factors which indicate that a petition was filed to abuse the purposes of the Bankruptcy Code, or to delay or frustrate the legitimate efforts of creditors to enforce their rights."[40] In other words, courts must review the totality of the circumstances in determining bad faith.[41] The Tenth Circuit has analyzed

---

[38] *In re Harmsen*, 320 B.R. 188, 200–01 (10th Cir. BAP 2005) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985)).

[39] *In re Dahlstrom*, No. 90–4094, 1992 WL 112238, at *2 (10th Cir. May 22, 1992) (unpublished) ("[L]ack of good faith may constitute 'cause' under § 1112(b).").

[40] *In re Winslow*, No. 91–1047, 1991 WL 261696, at *2 (10th Cir. Dec. 6, 1991) (unpublished).

[41] *In re Frontline Med. Servs. LLC*, 665 B.R. 818, 829 (10th Cir. BAP 2024) ("[T]he court must look at the totality of the circumstances and determine if the

this issue by considering certain nonexclusive factors from *In re Laguna Associates Ltd. Partnership* including whether a debtor: "(1) has only one asset; (2) has only one creditor; (3) acquired property which was posted for foreclosure and the prior owners had been unsuccessful in defending against the foreclosure; (4) was revitalized on the eve of foreclosure to acquire the insolvent property; (5) has no ongoing business or employees; [ ] (6) lacks a reasonable possibility of reorganization; and (7) the Chapter 11 filing stopped the foreclosure."[42]

Similarly, this Court has found the following factors meaningful in evaluating a debtor's good faith: "(1) the debtor has one asset; (2) the pre-petition conduct of the debtor has been improper; (3) there are only a few unsecured creditors; (4) the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court; (5) the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford; (6) the filing of the petition effectively allows the debtor to evade court orders; (7) the debtor has no ongoing business or employees; and (8) the lack of possibility of reorganization."[43] Other courts have also considered: (i) whether the petition serves a valid bankruptcy purpose, which assumes a

---

cumulative effect of the relevant factors gives rise to an inescapable conclusion that use of the bankruptcy process by the debtor is inappropriate.").

[42] *In re Nursery Land Dev., Inc.*, 91 F.3d 1414, 1416 (10th Cir. 1996) (citing *In re Laguna Assocs. Ltd. P'ship.*, 30 F.3d 734, 738 (6th Cir. 1994)).

[43] *In re Frontline Med. Servs. LLC*, 665 B.R. at 827 (citing *In re Nursery Land Dev., Inc.*, 91 F.3d at 1416).

debtor is in financial distress;[44] (ii) whether the petition is filed merely to obtain a tactical litigation advantage; and (iii) whether the debtor's financial problems involve essentially a dispute between the debtor and secured creditors that can be resolved in pending state court litigation.[45] Essentially, courts have been guided by a variety of other factors, and a multitude of inquiries may be conducted in a thorough examination of the totality of the circumstances.[46]

## V.    Discussion

### a.    The Bankruptcy Court did not err in finding Appellant was not in financial distress.

The Bankruptcy Court found Appellant was not in financial distress and highlighted several facts in support: (1) Two weeks before the bankruptcy filing and approximately five months after entry of the Judgment, Appellant elected to lease a new

---

[44] *See, e.g.*, *In re LTL Mgmt., LLC*, 64 F.4th 84, 101 (3rd Cir. 2023) ("[A] valid bankruptcy purpose 'assumes a debtor in financial distress.'") (internal citation omitted)). *See also Bank of Am. Nat'l Tr. and Sav. Assn v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999) ("the two recognized policies underlying Chapter 11 [are] preserving going concerns and maximizing property available to satisfy creditors").

[45] *See, e.g.*, *In re Melendez Concrete Inc.*, No. 11-09-12334 JA, 2009 WL 2997920, at *4 (Bankr. D.N.M. Sept. 15, 2009) (unpublished) (citing *In re Integrated Telecom Express, Inc.,* 384 F.3d 108 (3d Cir. 2004); *In re Nursery Land Dev., Inc.*, 91 F.3d at 1415; *In re Trident Assocs. Ltd. P'ship*, 52 F.3d 127, 130 (6th Cir. 1995); *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988).

[46] *See, e.g.*, *In re Nursery Land Dev., Inc.*, 91 F.3d at 1416; *In re Winslow*, No. 91–1047, 1991 WL 261696, at *2 (10th Cir. Dec. 6, 1991) (unpublished); *In re Frontline Med. Servs. LLC*, 665 B.R. at 827; *In re Laguna Assocs.*, 30 F.3d at 738; *In re Erkins*, 253 B.R. 470, 474–75 (Bankr. D. Idaho 2000) ("The existence of good faith depends on an amalgam of factors and not upon a specific fact." (internal citation omitted)); *In re Winslow*, 123 B.R. 641, 646 (D. Colo. 1991); *In re Muth*, 514 B.R. 719, 2014 WL 1712527, at *5 (10th Cir. BAP May 1, 2014) (unpublished).

$88,135.00 BMW sports utility vehicle[47] for his girlfriend even though he already owned eleven unencumbered vehicles;[48] (2) Appellant continued lavish spending during such period;[49] and (3) Appellant failed to respond in state court to the state court garnishment by asserting exemptions and/or objections under Colorado law.[50]

Appellant does not allege erroneous findings related to any of the underlying facts supporting the Bankruptcy Court's financial distress determination. Instead, Appellant argues the Bankruptcy Court erred by: (i) placing excessive weight on Appellant's solvency on a balance sheet test; (ii) placing greater weight on Appellant's financial health prior to his accounts being frozen than his financial health after his accounts were frozen (Appellant contends his spending habits prior to that moment should not be given weight in determining his financial distress on the petition date); and (iii) requiring Appellant to exhaust his remedies in state court before filing bankruptcy.[51] Specifically, Appellant argues he was in financial distress when his bank accounts were frozen leaving him with no available liquidity.[52]

The Bankruptcy Code does not contain any insolvency requirement (except as to chapter 9), nor does it direct any application of a specific test to determine financial distress.[53] Additionally, the Tenth Circuit has not addressed what it means to be in

---

[47] Order at 8 in Appellant's Am. App. at 206.
[48] *Id.* at 10 in Appellant's Am. App. at 208.
[49] *Id.* at 20 in Appellant's Am. App. at 244.
[50] *Id.* at 21 in Appellant's Am. App. at 219.
[51] Appellant's Br. at 5.
[52] *Id.*
[53] *See In re Bestwall LLC*, 658 B.R. 348, 370–73 (Bankr. W.D.N.C. 2023) (generally discussing insolvency and financial distress requirements, or lack thereof)

financial distress in this context. As discussed above, several courts have treated financial

distress as an additive factor in the totality of the circumstances analysis with a lack of

financial distress highlighting an improper purpose for filing.[54] Additionally, the Third

Circuit has established a standard for determining financial distress: a debtor must be in

"immediate" and "apparent" financial distress that justifies the need for bankruptcy

relief.[55] The Third Circuit held, without such distress, a debtor cannot demonstrate a valid

bankruptcy purpose or satisfy the good faith requirement under § 1112(b).[56]

    Here, the Bankruptcy Court did not err in determining Appellant was not in

financial distress. The record shows the Bankruptcy Court reasonably concluded

Appellant's claimed liquidity crisis was of his own making given available state-law

---

(citing *In re LTL Mgmt., LLC*, 64 F.4th 84, 102, (3d Cir. 2023)), *aff'd*, 148 F.4th 233 (4th Cir. 2025).

[54] *See, e.g.*, *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (10th Cir. 1986) ("Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities."); *Cedar Shore Resort, Inc.*, 235 F.3d 375, 379–80 (8th Cir. 2000) (in evaluating good faith, "courts consider the totality of the circumstances, including the court's evaluation of the debtor's financial condition"); *In re James Wilson Assocs.*, 965 F.2d 160, 170 (7th Cir. 1992) (recognizing that, while the Code permits an individual or firm to file though not insolvent, such filings usually involve "impending insolvency"); *In re Dixie Broad., Inc.*, 871 F.2d 1023, 1027 (11th Cir. 1989) (stating that whether a debtor is "financially distressed" is one factor evidencing bad faith).

[55] *In re LTL Mgmt., LLC*, 64 F.4th at 104.

[56] *Id.* at 110. This standard is essentially the functional equivalent of an insolvency requirement. James L. Baillie and Katherine A. Nixon, *Too Solvent to Be in Bankruptcy?* 2024, Ann. Surv. of Bankr. Law 1 ("Despite using the phrase 'financial distress' and emphasizing that financial distress does not necessarily equate to insolvency, the court nonetheless effectively imposed the functional equivalent of an insolvency requirement.").

remedies and substantial unencumbered assets.[57] Specifically, the record shows Appellant

was not insolvent.[58] Additionally, the record reflects Appellant maintained healthy

financial stability[59] and access to significant resources, including unencumbered or

lightly encumbered real estate and valuable unencumbered personal property. The record

illustrates Appellant's financial stability through his pre-petition spending including,

without limitation, living and vehicle expenses for his girlfriend, a ten-day Hawaiian

vacation, and travel to Washington and Oregon combined with credit card purchases on

one card in excess of $30,000 for the month of June. Similar spending habits continued

post-petition as evidenced by his request to include his girlfriend's expenses in his

emergency cash collateral use and a multi-week trip to Europe. All this spending was to

the exclusion of any payment on the Judgment or any effort to post a supersedeas bond or

otherwise remove or reduce the risk of loss associated with the appeal of the Judgment

entirely from Appellee.

---

[57] Applying the Third Circuit test, the record also supports the conclusion that Appellant was not in immediate and apparent financial distress that justified the need for bankruptcy.

[58] On the petition date, Appellant held approximately $7.6 million in assets and only $4 million in liabilities. Tr. at 24 in Appellant's Am. App. at 274.

[59] Appellant "was current on all of his debts when the case filed with the exception of the [Judgment] and the IRS." Tr. at 24–25 in Appellant's Am. App. at 274–75. There were no collection activities other than those related to the Judgment. *Id.* at 25 in Appellant's App. at 275. Appellant paid $2,800 each month to support his partner living in another state and requested to continue the same in his motion for cash collateral. *Id.* And, two weeks before filing bankruptcy (post-Judgment), Appellant signed a lease agreement for a new BMW providing for a $1,800 monthly car payment. *Id.* at 30 in Appellant's Am. App. at 280.

Although Appellant contends the garnishment created a liquidity issues, the Bankruptcy Court reasonably found Appellant's failure to use available assets to address the Judgment or the account freeze—either by liquidating property or asserting exemptions in state court—undermined the credibility of such claim.[60] Moreover, Appellant made one effort to obtain a supersedeas bond, which was not successful because he had not filed federal and state income tax returns for roughly ten years.[61] And, as of the September 19, 2024 hearing, Appellant still had not filed returns and had only just moved to employ an accountant to accomplish that task.[62] Under these circumstances, Appellant's assertion he suffered financial distress when his accounts were frozen is not persuasive, particularly given his failure to take remedial action in the five months after entry of the Judgment, either before or after the garnishment.

Appellant's additional arguments are also unpersuasive. The Bankruptcy Court did not place excessive weight or rely solely on Appellant's solvency or prepetition financial health. The Bankruptcy Court considered the totality of the circumstances, which, as courts in the Tenth Circuit have highlighted, includes considering the prepetition conduct of the debtor, whether the petition serves a valid bankruptcy purpose, and whether a

---

[60] Order at 6 in Appellant's Am. App. at 204.

[61] The record suggests Appellant made only a single attempt to obtain a bond. *See* Order at 19 in Appellant's Am. App. 217 ("[t]he only effort … was to contact an unidentified corporate surety"); *see also* Tr. at 39 in Appellant's Am. App. 289 ("Mr. McHugh will testify that he attempted to obtain an appellate bond.").

[62] Appellee's counsel argued Appellant "[came] in 48 days later and file[d] a motion to employ an accountant." Tr. at 85 in Appellant's Am. App. at 335; *see also Application to Employ [ ]* in Appellant's App. at 166.

14

debtor is in financial distress.[63] Nor did the Bankruptcy Court hold that Appellant was required to litigate the garnishments in state court before filing bankruptcy. Rather, these facts were simply additional factors in the totality of the circumstances analysis indicating a lack of financial distress.

Thus, the Bankruptcy Court did not err in determining there was no financial distress.

### b. The Bankruptcy Court did not err in holding Appellant's bankruptcy case was filed for tactical litigation advantage.

The Bankruptcy Court found the "entire reason" Appellant's case was filed was to obtain a tactical litigation advantage.[64] Specifically, the Bankruptcy Court found the bankruptcy filing, five months after the Judgment, was simply a substitute for posting an appeal bond.[65]

Appellant argues the filing of a bankruptcy petition as a substitute for posting an appeal bond is not bad faith per se and, thus, the Bankruptcy Court erred in concluding a debtor who is solvent under a balance-sheet test cannot use bankruptcy as a substitute for

---

[63] *In re Melendez Concrete Inc.*, No. 11–09–12334 JA, 2009 WL 2997920, at *3 (Bankr. D.N.M. Sept. 15, 2009) (unpublished) (prepetition conduct is relevant to the court's consideration of "cause" (citing *In re Nursery Land Dev., Inc.*, 91 F.3d 1414, 1415 (10th Cir. 1996))). *See also In re S-Tek 1, LLC*, No. 20-12241-j11, 2021 WL 4006019, at *7–9 (Bankr. D.N.M. Sept. 2, 2021) (unpublished); *In re Jet Sales West LLC*, No. 20-12179-ta11, 2021 WL 6013541, at *2–3 (Bankr. D.N.M. Dec. 15, 2021) (unpublished).

[64] Order at 21 in Appellant's Am. App. at 219.

[65] *Id*. at 23 in Appellant's Am. App. at 221.

posting an appeal bond.[66] Appellant argues the cases relied on by the Bankruptcy Court[67] are distinguishable on the facts and suggests it was error for the Bankruptcy Court to fail to consider Appellant's lack of liquidity.[68] Appellant highlights his uncontroverted proffer was he would propose a plan that paid Appellee—and other creditors—in full if Appellee has a final, allowed claim[69] and contends the Bankruptcy Court should have, at a minimum, given Appellant an opportunity to file his plan and disclosure statement before converting the case.[70] Finally, Appellant contends, because Appellant had a legitimate bankruptcy purpose for filing, the case was not filed merely to obtain a tactical litigation advantage.[71]

While the Tenth Circuit has not explicitly examined or defined an impermissible "litigation tactic," it has recognized chapter 11 cannot be used simply to frustrate a creditor when there is no realistic prospect of reorganization.[72] At least one other Circuit has examined whether a litigation tactic warrants dismissal and noted that dismissal may be warranted for filings seeking *only* to avoid posting an appeal bond in another court or where "the timing of the filing of a Chapter 11 petition is such that there can be no doubt

---

[66] Appellant's Br. at 6.

[67] *In re Boynton*, 184 B.R. 580, 582 (Bankr. S.D. Cal. 1995); *In re Davis*, 93 B.R. 501, 503 (Bankr. S.D. Tex. 1987).

[68] Appellant's Br. at 7–8.

[69] Tr. at 69–70 in Appellant's Am. App. at 319–20; Tr. at 80–81 in Appellant's Am. App. at 330–31.

[70] Appellant's Br. at 8.

[71] *Id.*

[72] *See In re Nursery Land Dev., Inc.*, 91 F.3d 1414, 1416 (10th Cir. 1996) (affirming sanctions where debtor acquired property to frustrate foreclosure efforts and filed with no reasonable possibility of reorganization).

16

that the primary, if not sole, purpose of the filing was a litigation tactic."[73] Essentially, a chapter 11 filing is an impermissible litigation tactic when, under the totality of the circumstances, the debtor invokes bankruptcy chiefly to gain procedural leverage in non-bankruptcy litigation, stalling enforcement, or using the automatic stay as a substitute for a supersedeas bond, *rather than to reorganize or maximize value*, especially where a debtor with means files after an adverse judgment to forestall a single creditor.[74]

While we agree the filing of a bankruptcy petition as a substitute for posting an appeal bond is not bad faith per se, based on the facts in this case, the Bankruptcy Court did not err in concluding Appellant's use of chapter 11 as a substitute for a supersedeas bond, without meaningful steps to secure a stay or pursue state-law protections, supports a bad-faith finding in this case. We note the Bankruptcy Court rejected Appellant's argument he was in financial distress because of the garnishment (and thus had a legitimate purpose for filing) and concluded instead the bankruptcy filing was a strategic attempt to avoid posting a supersedeas bond. The record supports this determination—Appellant waited five months after entry of the Judgment, had substantial unencumbered assets, and took no meaningful steps to seek a bond or pursue a stay in state court.[75] The Bankruptcy Court further found Appellant never filed the tax returns needed to obtain a

---

[73] *See, e.g.*, *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119–20, 128 (3d Cir. 2004) ("[I]f there is a 'classic' bad faith petition, it may be one in which the petitioner's only goal is to use the automatic stay provision to avoid posting an appeal bond in another court."); *In re 15375 Mem'l Corp.*, 589 F.3d 605, 618–20 (3d Cir. 2009).

[74] *See In re Marsch*, 36 F.3d 825, 828–29 (9th Cir. 1994); *In re Nursery Land Dev., Inc.*, 91 F.3d at 1416; *In re SGL Carbon Corp.*, 200 F.3d 154, 165–68 (3d Cir. 1999).

[75] Order at 20–21 in Appellant's Am. App. at 218–19.

bond, never moved for a stay, and continued liberal discretionary spending. These findings are also supported by the record and show the Bankruptcy Court did not impose per se rules that a solvent debtor cannot use bankruptcy as a substitute for posting an appeal bond or that a debtor must first pursue state-court remedies. Rather, the Bankruptcy Court treated Appellant's choice not to seek a stay or assert exemptions in the state court as indicative of evidence of both a lack of financial distress and a tactical bid for a "free" appellate stay and expressly framed these points as part of its broader totality analysis. Such a conclusion has merit—while Appellant received the protection of the automatic stay, Appellant effectively shifted the risk of loss resulting from the stay of execution on the Judgment to Appellee, a risk that would ordinarily be covered by a supersedeas bond but is not here.[76]

Appellant's attempt to distinguish *Boynton* and *Davis* also fails. In *Boynton*,[77] the debtors had "significant assets, largely in liquid form in an investment account with Goldman Sachs. The balance in that account as of the petition date was over $5,000,000. In addition, the debtors own[ed] real property, with one coastal residence assertedly having substantial equity, and some valuable personal property."[78] There, the court held "it is not at all clear that debtors could not have posted the requisite bond from the over $5 million in assets in their investment account, alone."[79] In other words, debtors had

---

[76] *Miami Int'l Realty Co. v. Paynter*, 807 F.2d 871, 873 (10th Cir. 1986) ("the purpose of a supersedeas bond is to secure an appellee from loss resulting from the stay of execution").

[77] *In re Boynton*, 184 B.R. 580 (Bankr. S.D. Cal. 1995).

[78] *Id.* at 581.

[79] *Id.* at 583.

assets available to post the requisite bond. As a result, the court, in reviewing the totality of the circumstances, held the bankruptcy case was filed in bad faith. There is nothing in *Boynton* suggesting a lack of liquidity will preclude a finding of bad faith. Rather, *Boynton* confirms a debtor's failure to use available resources to pursue non-bankruptcy remedies—such as posting a bond—is a valid basis for finding bad faith.

In *Davis*,[80] the court considered, among other facts, the debtor's apparent ability to meet all his economic expenses and the extent to which scheduled assets exceed scheduled liabilities in finding bad faith in avoiding the posting of a supersedeas bond. The court noted "[o]ne primary characteristic of those cases not finding bad faith is that the judgment together with the debtors' other liabilities substantially exceeded the assets."[81] Appellant argues *Davis* is distinguishable because here Appellant was unable to meet all his expenses after the account freeze. Such argument is unpersuasive. Like the court in *Davis*, the Bankruptcy Court here considered multiple factors including, but certainly not limited to, Appellant's overall solvent financial posture and prepetition conduct.

Thus, we hold the Bankruptcy Court appropriately considered the totality of the circumstances and did not err in determining Appellant's case was filed to obtain a tactical litigation advantage, which supported conversion based on bad faith.

---

[80] *In re Davis*, 93 B.R. 501 (Bankr. S.D. Tex. 1987).
[81] *Id.* at 503.

19

        **c.**       **The Bankruptcy Court did not err in finding Appellant's case was primarily a two-party dispute between Appellant and Appellee.**

The Bankruptcy Court acknowledged Appellee was not Appellant's only creditor, but found, aside from Appellee, no other creditors were taking action to collect from Appellant.[82] Appellant argues the Bankruptcy Court erred when it held the bankruptcy case was a two-party dispute because it failed to consider the IRS claim.

The Tenth Circuit has not explicitly addressed what it means for a bankruptcy case to be two-party dispute. Other courts have considered this question, and their opinions offer guidance. "A two-party dispute is shown when 'a debtor faces no threat from any other purported creditors.'"[83] While not dispositive, the number of creditors and the amount of claims they hold is also a relevant consideration in determining whether a bankruptcy case is really a two-party dispute.[84] Finally, at least one court has found a two-party dispute even when other creditors exist.[85]

---

[82] Order at 24 in Appellant's Am. App. at 222.

[83] *In re JKW Enters., LLC*, 660 B.R. 296, 302 (Bankr. N.D. Iowa 2024) (quoting *In re Obstetric & Gynecologic Assocs. of Iowa City & Coralville, P.C.*, 651 B.R. 1, 11 (Bankr. S.D. Iowa 2023)); *In re State St. Houses, Inc.*, 305 B.R. 738, 742 (S.D. Fla. 2003), *aff'd*, 356 F.3d 1345 (11th Cir. 2004).

[84] *In re Local Union 722 Intern. Bhd. of Teamsters*, 414 B.R. 443, 449 (Bankr. N.D. Ill. 2009).

[85] *See, e.g.*, *In re Ladouceur*, No. 16–17125, 2017 WL 5054307, at *5 (Bankr. D. Colo. 2017) (unpublished) ("The reason for the bankruptcy was to obtain the automatic stay to stop the two Wells Fargo foreclosures after Debtor was unsuccessful in obtaining a stay from the Tenth Circuit Court of Appeals. He was on a payment plan with the IRS and the credit card companies were not pursuing him.").

Here, aside from Appellee's collection efforts, no other creditors were pursuing claims or attempting to collect from Appellant prior to the petition date.[86] The Bankruptcy Court found Appellant was current on his obligations to other creditors and had only five nonpriority unsecured claims.[87] Specifically, the record indicates Appellant faced no threat or pressure from other creditors including the IRS and had, in fact, made substantial quarterly payments to the IRS during the ten year period.[88] Thus, based on the record, the Bankruptcy Court did not err in finding the bankruptcy case was primarily a two-party dispute despite the existence of the IRS debt. Finally, even if the Court were to assign error to the Bankruptcy Court's determination the bankruptcy was a two-party dispute, the Bankruptcy Court did not convert the case solely because it was a two-party dispute but rather this fact was but one of the circumstances, in addition to others, indicating bad faith. Taken as a whole, the record supports that conversion was warranted based on the totality of the circumstances.

---

[86] Appellant will testify that Appellee's "collection efforts forced him into this bankruptcy case." Tr. at 40 in Appellant's Am. App. at 290. The garnishments "froze up every dollar in any account that was in [Appellant's] name. Without access to those funds, [he] will testify that he was unable to pay his personal or business expenses, and that led to this bankruptcy filing. . . . The [garnishment] writ was issued on July 22nd, the funds were frozen on or around July 25th, and the bankruptcy case was filed on August 1st." *Id.* at 41 in Appellant's Am. App. at 291.

[87] Order at 24 in Appellant's Am. App. at 222.

[88] Although Appellant had other listed creditors, including five nonpriority unsecured creditors, none of those debts were in default or the subject of any collection action. *Id.* Additionally, while the IRS held a substantial claim, the record reflects Appellant had not filed tax returns, no tax assessment had been made, and the IRS had not initiated any collection efforts.

21

## VI.    Conclusion

The Bankruptcy Court's decision to convert the case did not result from any error in law or erroneous factual findings. Moreover, even if another court might have weighed the evidence differently, our role is limited. We must defer to the Bankruptcy Court's factual findings unless they are "completely devoid of minimum evidentiary support displaying some hue of credibility," or "bear[] no rational relationship to the supportive evidentiary data."[89]

Here, the Bankruptcy Court's findings are anchored in the record, and thus, they are not clearly erroneous. We may not reverse the Bankruptcy Court even though, had we been sitting as the trier of fact, we would have weighed the evidence differently.[90] Thus, we affirm.

---

[89] *In re Stewart*, 604 B.R. 900, 906 (10th Cir. BAP 2019) (quoting *In re Mama D'Angelo, Inc.*, 55 F.3d 552, 555 (10th Cir. 1995)).

[90] *Anderson v. City of Bessemer City*, 470 U.S. 564, 573(1985) ("This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.").